UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

United States of America,

                                        CR-05-0540 (CPS)

        - against -                      MEMORANDUM
                                        OPINION AND ORDER
Luis Escabi,

                Defendant.

-----------------------------------------X

SIFTON, Senior Judge.

    Luis Escabi was indicted on July 14, 2005 on one count of
conspiracy to money launder in violation of 18 U.S.C. §1956(h),
eight counts of money laundering in violation of 18 U.S.C
§1956(a)(1)(B)(I), and one count of structuring in violation of
31 U.S.C §5324(a)(3) and 18 U.S.C. §2. Presently before the Court
is Escabi's motion to suppress two statements made by him to law
enforcement officials and documents obtained from a search of his
apartment on the grounds that they were obtained as the product
of an arrest without probable cause, in violation of the Fourth
Amendment. For the reasons set forth below the defendant's motion
is denied.

## Background

    The following factual findings and legal conclusions are
made based on the submissions of the parties in connection with
this motion and evidence presented at the suppression hearing.
Disputes are noted and, where material, resolved.

In early 2002, as part of an undercover investigation by the King's County District Attorney's office, Escabi was observed picking up $10,000, which the state investigators had been told by a confidential informant constituted proceeds of drug transactions, from the confidential informant. Thereafter an investigator from that investigation, who had transferred to a Federal/State task force, code-named El Dorado, relayed this information to other members of the task force who, as a result, began surveillance of Mr. Escabi. The information from the informant included Mr. Escabi's name, address, and that Mr. Escabi was laundering drug money.[1]

On June 9, 2005, at 9:15 a.m. federal agents from the task force observed Escabi leave the residence identified by the informant, drive in a blue Toyota Camry, NY license plate #DBZ-5253, to a Chase Bank branch in Ridgewood NY, enter the bank, and hand a large stack of money to a teller. After Escabi left the bank an agent identified himself to the bank manager and obtained information confirming that Escabi had deposited $7,350 in cash into an account held by Nova Computech Inc.[2]

---

[1] The task force witness at the hearing had no information concerning the informant's reliability and the informant's information, in all events, would be considered "stale."

[2] Under 31 C.F.R § 103.22(b)(1) "each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000, except as otherwise provided in this section." Furthermore under, 31 U.S.C. § 5324 "no person shall, for the purpose of evading the reporting requirements of section

Escabi then drove approximately three miles to a Washington Mutual Bank branch and at 9:35 was again observed giving cash to a teller.  When Escabi left the bank agents determined he had deposited $8,600 in cash into an account in the name of Rogelio Rios.

Escabi next drove ten more miles to a second Washington Mutual Bank branch, this one located in Rego Park.  At 10:10 a.m. he was again observed handing cash to a teller.  Agents confirmed with bank management that he had on this occasion deposited $7,500 in cash into an account in the name Milton Cesar Rojas Amado.

Escabi next drove one or two miles further to a second Chase Bank branch located in Forrest Hills Queens.  At 10:35 a.m. agents observed him turn over a large stack of cash to a teller. After Escabi left, agents confirmed that he had deposited $8,000 in cash into the same bank account in the name of Nova Computech Inc. into which Escabi had deposited $7,350 one hour and twenty minutes earlier at the Ridgewood Chase branch.

Later that day, at approximately 5:50 p.m., agents observed Escabi leave his residence with a plastic bag which he deposited in a public trash can.  Agents retrieved the bag which they found to contain a torn deposit slip, money order receipts and hand-

5313(a) or 5325 or any regulation prescribed under any such section . . . structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."

written notes. The deposit slip corresponded to the $8,000 deposit Escabi had made at 10:35 a.m. at the Forest Hills Chase branch into the account of Nova Computech Inc.

The seven money order receipts all reflected purchases on June 4, 2005 at three separate post offices, all marked with the word, "chien." Two money orders in the amount of $1,000 each were purchased at the first post office. Two money orders in the amount of $1,000 were purchased at a second post office. Two money orders of $1,000 and one of $500 were purchased at a third post office.[3]

The top half of the first handwritten note contained an account number, the words "Chase," and "Nova PC" and the monetary figure "$15,350." The account number corresponded to the Nova PC account into which the defendant had, earlier that day, made two deposits at two different Chase bank branches. The two deposits of $7,350 and $8,000, totaled 15,350.

The bottom half of the handwritten note also listed an account number, the words "Milton Cesar Rojas Amado" and "wash-mut" and the monetary figure "$7,500." This information

---

[3] "No financial institution may issue or sell a . . . money order to any individual in connection with a transaction or group of such contemporaneous transactions which involves United States coins or currency . . . in amounts or denominations of $3,000 or more unless – "the individual furnishes the financial institution with such forms of identification as the Secretary of the Treasury may require in regulations which the Secretary shall prescribe and the financial institution verifies and records such information in accordance with regulations which such Secretary shall prescribe." 31 U.S.C. §5325(a)(2).

corresponded to the 10:10 a.m. deposit of $7,500 made at a Washington Mutual bank into an account in the name of Milton Cesar Rojas Amado with the same account number.

The second handwritten note contained an account number, the words "Rogelio Rios" and "Washington Mutual" and the monetary figure $8,600 corresponding to the 9:35 a.m. deposit at the second Washington Mutual branch of $8,600 into an account held in the name of Regelios Rios with the same account number.

Other handwritten notes contained names, contact information, and monetary amounts. One note contained an address and phone number for "DVTS," the name Luis Guerrero" and the monetary figure, "$5,000." Another note contained an address and phone number for "Le Novia," the monetary figure "$5,500" and the name "Andersson." A third note contained an address and phone number for "Inadvance," the monetary amount, "$2,500" and the name "Jaime Saltizabac." A final note contained an address and phone number for "Veronica's Fashion," the monetary figure $8,000 and the name "Andersson."

On June 10, agents again observed Escabi. At 10:45 that morning he entered a Bank of America branch in Ridgewood and was observed giving cash to a teller. After Escabi left agents confirmed that he had deposited $1,550 into an account in the name of Alvaro Porras and $2,500 into an account in the name of Ingrid Pena.

Immediately thereafter, at 11:10 a.m. Escabi entered the Washington Mutual Bank Ridgewood branch visited by him at 9:35 a.m. the preceding day.[4]  He was observed giving cash to a teller.  Agents later confirmed that he had deposited $3,000 into an account held by Mauricio Alfonso.

At 11:15 a.m. Escabi entered a post office on Myrtle Avenue in Brooklyn, but left shortly thereafter without conducting any transactions.  He then proceeded to a different post office in Ridgewood.  At 11:45 a.m. he purchased three money orders, two in the amount of $1,000 and one in the amount of $500, and mailed a priority mail package to "Chica's fashions."[5]  Agents obtained a receipt for these money orders from workers at the post office.

At 12:15 p.m. Escabi entered a post office in Elmhurst where he mailed 4 priority mail packages.  Agents xeroxed copies of the labels on these packages.  Each package was addressed to a company whose name was listed on one or another of Escabi's handwritten notes.  The return address on each corresponded to Escabi's home address.  However, the name of the sender on each return address varied; each corresponded to the name on one of Escabi's handwritten notes recovered from the trash the preceding day.  Escabi also purchased one money order for $1,000 and one

_____

[4]The prior days' deposit at this branch was in the name, "Milton Cesar Rojas Amado."

[5]The agents were unable to view the priority mail envelope and thus information such as the return address is unknown.

for $500. Agents were again able to obtain a receipt for these money orders from postal workers.

At 3:30 p.m. Escabi entered a Bank of America branch in Ridgewood. This was the same bank where Escabi had already made a deposit at 10:45 a.m. that same day. Agents observed him hand cash to a teller. They later confirmed that he had made a $6,000 cash deposit into an account in the name Cellular Link Communications.

Four days later, on June 14, agents again conducted surveillance and observed Escabi driving the blue Toyota, in which he was observed on June 9, in Queens. They observed a Hispanic male, later identified as "Mortes," enter Escabi's car carrying a black knapsack. Agents observed "Mortes" remove a white and gray shopping bag from his knapsack and place it on the floor of the car behind the driver's seat. Mortes then exited the vehicle with his knapsack, which appeared empty. Escabi continued to a post office. He took the white and gray shopping bag into the post office where he retrieved his mail and picked up two packages. He then drove back to his apartment and parked his car on the street.

At this point Task Force Officer Cortes approached the driver's side of defendant's car while Agent Conway approached the passenger side. A third agent, named Lana, remained standing a car length behind Escabi's vehicle. Agents Lana and Conway were

armed, but their weapons were concealed.  Cortes and Conway
identified themselves to Escabi as law enforcement agents and
requested the defendant's identification, car registration and
proof of insurance. Escabi complied.  Agents then engaged Escabi
in conversation and elicited responses from him indicating that
the car he was driving was his, that he had just been to the post
office, that the shopping bag on the front seat of the car had
been given to him by a man he did not know and that it contained
money.  Officer Cortes then asked the defendant how he knew the
bag contained money and not a bomb.  In response the defendant
showed the agents a bundle of money he took from inside the
shopping bag.[6]  It was later determined that the cash totaled
approximately $35,000. The agents then obtained Escabi's consent
to search the car.

　　After the car search the agents asked Escabi if they could
accompany him to his apartment to talk further. Escabi agreed and
the agents returned with him to his apartment. According to the
agents Escabi pulled out his keys to open the front door, but his
mother, apparently having heard their arrival, simultaneously

---

[6]Escabi asserts in an affidavit that the agents ordered him to open the
bag. Agent Cortes credibly testified in a coherent, consistent, and detailed
manner to the contrary. While I draw no adverse inference from Escabi's
decision not to take the stand,  I note that his failure to do so has left the
Court with little evidence supporting his version of events.  *Cf. United
States v. Mullens,* 536 F.2d 997, 1000 (2d Cir. 1976) ("[The defendant] chose
not to take the stand during the suppression hearing and rebut the version of
events although he might have done so without risk that anything he said could
later be used against him at trial.").  Because the Court has determined that
Cortes's testimony is credible, based in part on his demeanor on the stand,
his testimony is simply more persuasive.

opened the door.[7]

According to Escabi, he introduced the agents to his mother, who was watching television, as his friends, so as to avoid embarrassment. Escabi thereafter led the agents to his room so as not to disturb his mother.[8]

Once in the bedroom the agents told Escabi that he was not under arrest, that they had observed him at various banks and gave him *Miranda* warnings. The defendant waived his *Miranda* rights and agreed to speak without counsel. During the subsequent 10 minute interview defendant admitted that he (1) went to a number of banks over the preceding 2 days to deposit money; (2) went to different bank branches because he did not want the banks to notify the government of his deposits; (3) that his brother, who has a business in the Dominican Republic, told him how to deposit the money, whether to deposit the money or send it in money orders and where to send the money orders; and (4) that he did not know where the money came from.

The agents then requested permission to search Escabi's

---

[7]Escabi states in his affidavit that he told the agents that he did not have his keys, but that the agents did not believe him, that he knocked on the locked apartment door, and his mother let him inside. Both Agent Cortes and Agent Conway testified that they "distinctly" remembered the defendant pulling out a key. Applying the same reasoning as applied in the preceding footnote, I find that the agents' testimony is more persuasive than Escabi's assertions in his written affidavit.

[8]Escabi states that the agents asked which room was his and then said in substance, "let's go to your room." Both agents testified credibly that the defendant led the way into his bedroom. I again find that the agents' testimony is persuasive.

bedroom. He orally consented and signed a written consent. During a 30-minute search, confined to Escabi's bedroom, several bank deposit slips and handwritten notes of financial transactions were recovered. Midway through the search Agent Lana left the apartment to contact his supervisor. Task Force Officer Green and Agent Eisert arrived at the apartment.

Agent Eisert again advised Escabi of his *Miranda* rights and Escabi signed a consent agreeing to speak without counsel. Escabi then admitted, during a 20-minute interview, that (1)among the items he had thrown away in the public trash receptacle days earlier were deposit slips for money deposits that he had made and subsequently ripped up; (2) he believed the monies he deposited in the bank accounts were drug trafficking proceeds; (3) he did not know the identity of the person delivering money to him or receiving money from him; and (4) his normal practice of learning where and when to pick up money was that he would receive a phone call from an unknown individual who would tell him that he was calling on behalf of Escabi's brother's business, that this individual would tell Escabi that he had something for Escabi and then the individual would ask the defendant where he wanted to meet.

After approximately an hour spent in Escabi's apartment he was formally placed under arrest. At the defendant's request he was handcuffed out of his mother's sight in the hallway. Officer

Cortes then transported the defendant to the agents' office. Officer Cortes did not ask the defendant any questions during the drive. Upon arrival the defendant was again interviewed by Agent Lana and admitted to prior drop-offs and pick-ups, with unknown individuals, of sums totaling tens of thousands of dollars over the past year.

## Discussion

Defendant seeks to suppress his statements to law enforcement official and the evidence obtained from the search of his residence on the ground that they were the fruit of an illegal arrest made without probable cause. Assuming, as defendant contends, that he was under arrest by the time agents obtained the first statement from him as a result of questioning in the bedroom of his residence, the agents had ample probable cause to believe that he had committed the crime of structuring financial transactions so as to evade bank reporting requirements.[9]

Law enforcement agents have probable cause to arrest a defendant when, at the moment of arrest, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91 (1964).

---

[9] see footnote 1.

Probable cause is "a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). It requires "more than rumor, suspicion, or even a strong reason to suspect" (*U.S. v. Fisher*, 702 F. 2d 372, 375 (1983) (quoting *Brinegar v. U.S.,* 338 U.S. 160 (1949)), but does not require that the government make a "prima facie showing of criminal activity," (*U.S. v. Cruz*, 834 F.2d 47,50 (2d Cir. 1987)) or demonstrate that "it is more probable than not that a crime has been or is being committed" *Id.*, or "have in hand evidence which would suffice to convict." *Wong Sun v. U.S.,* 371 U.S. 471, 479 (1963).

Here, the agents had reason to suspect the defendant and place him under surveillance because of information provided by one of their fellow agents that defendant had engaged in laundering drug proceeds in the past. Agents also observed Escabi make eight separate deposits at three different banks over the course of two days, into accounts not in his own name, and each in amounts approaching but not equaling $10,000. Two of these deposits were made at two separate branches of the same bank and into the same account, one at 9:15 a.m. on June 9 and the other at 10:35 a.m. that same day.

Thereafter agents observed defendant's purchase of money orders in amounts under $3,000, thereby avoiding the Post Office

reporting requirement. On June 10, 2005 defendant purchased $4,000 in money orders but did so at different post-offices and always in increments under $3,000. Evidence recovered from defendant's trash reflected that on June 4, 2005 defendant purchased $6,500 in money orders, also in increments under $3,000. Agents further observed Escabi mail several priority mail packages, all with false names over the return address.

Defendant concedes that this evidence at least qualified as the "reasonable suspicion" necessary for a "Terry stop," *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968), and does not challenge the admissibility of the $35,000 recovered from Escabi's car. If probable cause did not exist before the government stopped Escabi, it certainly existed after discovery of the large bundle of cash. Escabi has no discernable source of income, and his possession of a large quantity of cash is in and of itself suspicious. Combined with the pattern of small bank deposits and postal orders the money further confirmed the agents probable cause to believe that the initial tip they received that defendant engaged in money laundering was correct. *U.S. v. Babwah*, 972 F.2d 30, 34 (2d Cir. 1992) ("the fact that defendants made incremental deposits of just below $10,000 while sitting on such a large sum of cash, gives rise to a reasonable inference that they had knowledge of the reporting requirement at the time they made those deposits

and that they wilfully conspired to withhold from the Government the information to which it was entitled"); *U.S. v Torres* 2002 WL 72929 *5 (S.D.N.Y. 2002) (defendant's possession of $151,000 in cash was a contributing factor to a determination of probable cause, in combination with other suspicious behavior); *U.S. v. Cervantes,* 19 F.3d 1151, 1153 (7th Cir. 1994)(possession of a large wad of cash combined with proximity to a known drug dealer created probable cause).

The defendant argues that this case is controlled by *U.S. v. Babwah*, 972 F.2d 30(2d Cir. 1992), in which the court of appeals found no probable cause. In *Babwah* agents observed defendant Maharaj enter a bank with a brown paper bag (later established to have held $19,980). Maharaj attempted to deposit approximately half the money into his own account and half into his co-defendant's account. Agents overheard Maharaj question a bank employee about government requirements that banks submit currency transaction reports *Babwah*, 972 F.2d 30,31. Agents subsequently observed defendants leave their residence carrying a large suitcase, drive a circuitous route to a second location, pick up several more suitcases and then drive away employing evasive driving techniques. *Babwah*, 972 F.2d 30, 33. Based on these facts[10] the Court of Appeals found that there was no probable

---

[10] In his suppression motion Escabi asserts that the finding of no probable cause also took into account that defendants had made at least 6 deposits ranging from $9,500 to $10,000 (*U.S. v. Babwah*, 972 F.2d 30,34 (2d

- 15 -

cause to arrest.

However, *Babwah* is not controlling. Escabi made eight
deposits, all in amounts under $10,000 and none into his own
account. Deposits to a single account were made at different
branches of the same bank within a short time of each other.
Three different banks were used. Escabi also visited multiple
post offices, buying 10 different postal orders, all in amounts
under $3,000. He also mailed out four priority mail packages with
fraudulent names over his own return address. The agents matched
both the deposits and money order purchases to records destroyed
by the defendant. Finally, the defendant was observed receiving
$35,000 in cash from a man he did not know. In *Babwah* the
information relied on was simply the defendant's attempt to
deposit just under $10,000 into his own account and just under
$10,000 into another account, after which he engaged in evasive
driving.

Escabi was properly Mirandized and properly consented to the
search of his apartment. His confession and the evidence obtained
from his apartment were obtained pursuant to a lawful arrest.

<u>Conclusion</u>

For the foregoing reasons, the defendant's motion to

_____

Cir. 1992). However, while evidence was evidently admitted at trial, there is
no indication that the agents knew of it when they initially stopped the
defendants. In any event, information available to the agents in this case far
exceeded that relied on by the agents in *Babwah*.

- 16 -

suppress evidence obtained during the search of his apartment and the statements made by him in his apartment is denied.


     The Clerk is directed to furnish a filed copy of the within to all parties.


     SO ORDERED.

Dated :   Brooklyn, New York

       September 7, 2005


        By: <u>/s/ Charles P. Sifton (electronically signed)</u>
           United States District Judge